## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SURESHOT GOLF VENTURES, INC., | § § § | CIVIL ACTION NO. 20–1738 |
| *Plaintiff,* | § § | |
| v. | § § | |
| TOPGOLF INTERNATIONAL, INC., | § § | JURY DEMANDED |
| *Defendant.* | § § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff SureShot Golf Ventures, Inc. ("SureShot") respectfully files this action for treble damages under the antitrust laws of the United States against Defendant Topgolf International, Inc. d/b/a Topgolf Entertainment Group ("Topgolf").

## I. PROCEDURAL HISTORY

1.     Plaintiff SureShot filed a Complaint alleging antitrust violations in this District on January 17, 2017 (hereinafter, *SureShot I*). The District Court dismissed the action with prejudice on the pleadings. SureShot appealed to the Fifth Circuit Court of Appeals. On October 9, 2018, the Fifth Circuit affirmed the District Court's dismissal, but modified the order to reflect dismissal without prejudice. The Fifth Circuit affirmed "[b]ecause the case is not ripe," and thus did not "analyze whether SureShot alleged a cognizable antitrust injury as required for antitrust standing." *SureShot Golf Ventures v. Topgolf Int'l, Inc.*, 754 Fed. Appx. 235, 241 n.3 (5th Cir. 2018).  The Fifth Circuit's opinion concluded that the Complaint in *SureShot I* was

"ambiguous about the nature and immediacy of SureShot's injury, and the remainder of its complaint reads in hypotheticals and future threatened injury." *Id* at 240.

2.     As alleged below, additional facts establish that SureShot's antitrust complaint is not only ripe, but once again satisfies the elements for antitrust standing and injury, as the "feared actions" that result from anti-competitive conducts are reflected in both market realities and Topgolf's near complete domination of the golf entertainment market. *Id.* at 241.

## II.     INTRODUCTION

3.     The antitrust laws forbid a monopolist from foreclosing competition by vertical integration that makes rival entry or growth more costly, riskier, and less likely. For example, a firm who otherwise acquired its monopoly by lawful means may not, with the intent to foreclose entry of a new rival, acquire essential technology or patents and then effectively make its use by rivals economically infeasible.

4.     These harms are not theoretical. The Draft Vertical Merger Guidelines by the Department of Justice and Federal Trade Commission, issued in January 2020, identify the harms, such as those suffered by Plaintiff SureShot, as inimical to maintaining competitive markets for the benefits of consumers and market participants at various levels.[1] Indeed, "Example 5" of the Draft Vertical Merger Guidelines largely mirrors the allegations in this case. Importantly, the Guidelines observe that, as applied to the facts of this case, the analysis should focus on whether

---

[1]     *See* https://www.ftc.gov/news-events/press-releases/2020/01/ftc-doj-announce-draft-vertical-merger-guidelines-public-comment.

following Topgolf's (the dominant company) purchase of Protracer (the supplier of a key ingredient or product), the "merged firm may find it profitable to refuse to supply the ingredient to any rivals or potential rivals if doing so would deter SureShot (the company considering entering the relevant market) from entering, or prevent it from financing entry …." Topgolf would not have purchased Protracer if it was not profitable for them both, and the facts here establish that the "likely result was that competition in the relevant market [was] substantially lessened …."

5.     Not unexpectedly, the Federal Trade Commission investigated Topgolf's acquisition of Protracer because of its potential anti-competitive harm to the market and competitors. Plaintiffs do not at this time know the status of the FTC's investigation or conclusions.

6.     Topgolf is the dominant business in operating golf entertainment facilities. Other than a handful of other golf entertainment facilities, if that, it is the dominant golf entertainment business in the United States. These centers combine "luxury simulator experience and golf ball tracing tech" with video games, hospitality, and other forms of entertainment, such as video games. Topgolf prides itself as "the only entertainment center of its kind" and the global leader in sports entertainment. At or near the time of the filing of *SureShot I*, Topgolf was operating approximately 28 U.S. locations, and three U.K. locations. As of March 2020, Topgolf venues alone had increased to "60 locations across the U.S. and internationally."

7.     Since *SureShot I*, Topgolf's market dominance has only increased, with the assistance of Callaway Golf Company, one of the leading golf equipment makers

in the world.  Topgolf Entertainment Group is the umbrella company of the various Topgolf brands and "is a global sports and entertainment community that connects nearly 100 million fans in meaningful ways …." TEG's "brand expressions includ[e] Topgolf venues, Lounge by Topgolf, Toptracer, Toptracer Range, Topgolf Swing Suite, Topgolf Studios, Topgolf Live and World Golf Tour [WGT] by Topgolf." *See* https://press.topgolf.com/about-us.

8.     From its inception in 2000 until 2016, Topgolf was the only interactive entertainment, food and beverage golf facility in the United States. Thus, Topgolf enjoyed the entire market share in the industry and the unfettered power to set monopoly prices. When Topgolf learned that a new competitor—Plaintiff SureShot—was to enter the golf entertainment market using a proprietary technology that Topgolf did not use in its business—technology that would create a more-interactive and friendly consumer experience—Topgolf  undertook intentional, predatory action to foreclose new competition from emerging SureShot. It did so by purchasing Protracer, the company that created and owned the unique technology that is at the heart of this case. Protracer and SureShot had signed a licensing agreement in April 2015. In late May 2016, Topgolf announced its acquisition of Protracer. SureShot learned then for the first time that its competitor, Topgolf, had purchased Protracer.

9.     This anticompetitive behavior by a monopolist eliminates or reduces competition in the high-end golf entertainment market, thereby drastically reducing or eliminating consumer choice in the market, in violation of the antitrust laws.

### III.   PARTIES

10.   Plaintiff SureShot Golf Ventures, Inc. is a Texas corporation. SureShot was injured in its business by reasons of Defendant's illegal conduct forbidden by the antitrust laws.

11.   Defendant Topgolf International, Inc. is registered as a foreign for-profit corporation engaging in interstate and international commerce. Summons may be served on its Texas registered agent, C T Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136, or wherever else it may be found.

### IV.   JURISDICTION AND VENUE

12.   This action is brought under Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 15, 18, to recover treble damages, costs, and attorney's fees for the injuries sustained by Plaintiff SureShot because of Defendant's violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton act, 15 U.S.C. § 18.

13.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 15(a), 18.

14.   Venue is appropriate in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d) because during the relevant period Defendant resided or transacted business in this District, a substantial portion of the affected commerce described herein was carried out in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

### V.    The Facts

**A.  Topgolf dominates the high-end golf entertainment market.**

15.    Topgolf was founded in 2000 and now is based in Dallas, Texas. It operates golf entertainment centers in the United States and internationally.

16.    Topgolf's game, prior to its acquisition and incorporation of Protracer into its business, combined a driving range-type environment, where golfers hit golf balls at outdoor targets, with food and beverage service, golf services, entertainment, and other amenities. Golfers teed off from a hitting bay onto a landscaped driving range, with targets ranging in distance. Using Topgolf's then technology, golfers learned how far they have hit a shot and how close to the pin and were allocated points based on distance and accuracy. The end result is a sports-bar-type entertainment facility merged with golf games.

17.    Topgolf is expanding quickly, both domestically and internationally. Since *SureShot I* was filed, Topgolf has opened dozens of new locations, essentially doubling in size, if not more, and expanded its brand into new divisions and golf-related activities, such as driving ranges, golf tours, and golf competitions in collaboration with other well-known sports brands.

**B.    SureShot was poised to enter the market.**

18.    SureShot was formed to compete with Topgolf's golf entertainment facilities. SureShot saw the opportunity to take a different approach and create a unique and potentially better game and entertainment experience. The SureShot model was going to use high-speed video cameras and software that would track the

balls in flight, creating a unique, immersive Three Dimensional (3-D) ball flight and gaming experience for customers. SureShot's game experience would be superior to Topgolf's, attract customers away from Topgolf, and reduce Topgolf's market share, thus reducing or eliminating Topgolf's ability to set a monopoly price and increasing competition in the market. Similar to Topgolf, the planned facilities would consist of a golf-driving-like range, but it would be uniquely designed for the SureShot-designed games. The SureShot venues also would have a sports bar and meeting rooms for corporate events.

19.     SureShot expended significant effort and resources to position SureShot for success. SureShot engaged design and architecture firms; developed SureShot's own technology to work seamlessly with technology owned by a Swedish company called Protracer; built a prototype center; tested different ideas for ball tracking; built testing and prototype gaming software; engaged attorneys to create private placement memorandums and advise on intellectual property; secured funding; researched to negotiate with technology providers and pinpoint appropriate locations; and entered  contracts for licensing, supplies, facilities, support, and technology.

**C.     SureShot built its model on the Protracer platform.**

20.     The bases of SureShot's unique game design were the high-speed cameras and sensors that track the golf ball in flight, which were developed by Protracer. Founded in 2006, Protracer developed first-of-its-kind cameras combined with software capable of tracking the flight of multiple golf balls in a camera feed, adding graphics to make the ball flight visible in near real time on a monitor. This is

the technology used by television networks covering professional golf tournaments, among other sports.

21.     Protracer's proprietary hardware and software is, according to Topgolf, "the only technology on the market that actively tracks all ball flight paths across an entire field of vision, powering television broadcasts and golf driving ranges." Protracer was the only commercially available technology to a startup like SureShot to compete against Topgolf. By building its own unique technologies on top of the technical foundation provided by Protracer, SureShot would be able to create a highly differentiated offering compared to Topgolf.  The golf entertainment facilities that SureShot was going to build to compete with Topgolf each costs in the tens of millions of dollars to build.

22.     Upon information and belief, Protracer's is the only technology on the market that actively tracks and analyzes every shot hit on a driving range across an entire field of vision, significantly enhancing a golfer's practice session or, in the case of a golf entertainment center, enhancing the entire game experience. Protracer has also developed a turn-key system for managing and maintaining a complex ball-tracking system across a large-scale driving range facility, addressing the challenges of keeping the system calibrated, tracking shots across multiple bays, mapping tracked shots to physical targets, and determining which shot came from which bay. Protracer is the only ball-tracking provider that provides such a comprehensive solution reliably and economically.  In other words, Protracer is the only system that

has been developed and demonstrated to work effectively across more than 100 bays, which is the scale of a golf entertainment center.

23.    In addition to being able to track balls across a wide field sufficient to meet the needs of a golf entertainment center, Protracer had other unique capabilities that made it the only viable technology platform for SureShot. For example, other tracking systems cannot track the ball when it hits the ground and rolls. With the high-resolution cameras and superior back-end processing available through Protracer, the ball can be tracked as it rolls, allowing for the design of a game where the player can be awarded points not only for its accuracy in the air, but also for how close a ball then rolls towards the target.

24.    It is this unique technology that SureShot chose as its technology platform when it built its own unique game software, making the technology vital to its business model. Indeed, SureShot invested considerable time and money building its own infrastructure around Protracer. It took SureShot nearly nine months to qualify the Protracer system for use in its business, with Protracer even making a number of improvements to ensure the product met SureShot's specific requirements.

**D.    SureShot contracted with Protracer.**

25.    On April 17, 2015, SureShot and Protracer entered into a Frame Agreement for the Supply of License, Support and Maintenance of Professional Services (the "Frame Agreement"), which governs "the sale of Protracer Range Sensors, license of Protracer Software Products, Professional Services and Support and Maintenance of Protracer Range Systems in Customer facilities."

26.     The Initial Term of the Frame Agreement was five years, ending in 2020. The agreement contained one-year renewals following the initial term, although either party could terminate the agreement by giving advance notice. SureShot asked Protracer about Topgolf; Protracer stated that it had received no interest from Topgolf. Protracer further stated that it would not enter into exclusive dealing contracts with SureShot or others, meaning its essential technology would not fall into the hands of a single firm who would refuse to share it with competitors. Importantly, given the barriers to entry without Protracer's intellectual property, SureShot inquired about Protracer's long-term plans; Protracer responded that its "aim [was] to stay neutral as a tracking provider for GEF [golf entertainment centers]."

27.     The Frame Agreement required Protracer to "deliver, install, calibrate and test the Protracer Range Systems" in up to 500 bays in up to five facilities each year during the Initial Term, to a maximum commitment of 1600 bays ("Supply Commitment").

28.     In addition, the Frame Agreement required Protracer to provide Support and Maintenance of the Protracer Range System to SureShot for five years after acceptance of the System by SureShot, pursuant to a Support and Maintenance Agreement ("Support and Maintenance Agreement"). The support and maintenance contemplated by the agreement necessarily provided Protracer access to SureShot's facilities, as well as an intimate knowledge of how the facilities are operated, among other information.

29.     The Support and Maintenance Agreement required Protracer to provide support of the Protracer Range System, including developer and on-site support. Specifically, Protracer Service Managers must "visit (i) each new Customer facility twice a year . . . and (ii) each existing Customer facility once a year" to inspect, maintain, and calibrate the system. This obligation meant that SureShot was required to inform Protracer of its plans to open new facilities, as well as providing access to its existing facilities.

30.     Both the Frame Agreement and the Support and Maintenance Agreement contemplated that the parties would have access to the other's sensitive, proprietary, and non-public confidential information. Thus, the agreements obligated the recipient of any such confidential information to protect it from unauthorized disclosure.

### E.      Topgolf's anticompetitive conduct forecloses competition.

31.     Topgolf learned of SureShot's intentions to enter the market as its direct competitor. Hearing that a competitor was entering the market with the benefits of better technology, Topgolf used its position as a monopolist to acquire Protracer, who had until then, expressed its intention to remain vendor neutral. On May 24, 2016, Topgolf announced its acquisition of Protracer. Topgolf used its market power to foreclose SureShot from entering the market by effectively cutting off the supply to SureShot of the unique, leading-edge Protracer technology upon which the SureShot model was built and based.

32.     Following its acquisition of Protracer in the summer of 2016, Topgolf announced that it would license Protracer only to "driving ranges," not golf entertainment centers. *See* https://topgolf.com/uk/company/press-room/press-releases/2016/topgolf-adding-broadcast-media-technology-with-protracer-acquisition/.   However, after rebranding Protracer as "Toptracer," Topgolf has effectively ended any use of Protracer by outside parties. Topgolf's range business, Toptracer Range, is now located within country and golf clubs throughout the country and internationally. Such business ventures involve Topgolf's control of the essential components and licensing of the Protracer (now called Toptracer) technology. Upon information and belief, no new entertainment venues such as was being developed by SureShot have been allowed to use Protracer (now Toptracer).

33.     Other facts and circumstances show Topgolf's anticompetitive conduct. For example, SureShot was engaged in informal talks with ClubCorp, "The World Leader in Private Clubs®," about potential business opportunities. During those talks, SureShot shared some of its business plans and potential locations with ClubCorp. Not long after the informal talks, and despite earlier having shown interest, ClubCorp's executives went silent, indicating ClubCorp's abandonment of any further talks with SureShot. Later, in June 2017, Topgolf and ClubCorp announced that they were entering a "strategic alliance … result[ing] in Topgolf providing new technology and benefits for ClubCorp members, and ClubCorp providing special offers and experience at ClubCorp clubs."

34.     Topgolf's intent to foreclose the market to SureShot and other competitors is illustrated by its reaction to SureShot's request for assurances that Protracer would continue to be made available to SureShot even after the initial 5-year term (and after SureShot would have spent tens of millions dollars).  SureShot's owners met with top executives of Topgolf in Houston, Texas. SureShot asked for those assurances, namely that Topgolf's acquisition of Protracer would not turn effectively into a de facto exclusivity arrangement with respect to any direct competitor of Topgolf; Topgolf refused, with one of its top executives stating, "If I was in your position, I would look for alternatives."  SureShot followed up with the executives about an extension of the 5-year term in light of the enormous capital required to design, build, and operate a golf entertainment center, but again Topgolf stated no decision had been made.

35.     Thus, even as Topgolf's executives were saying that Protracer would be kept as a separate entity, which turned out to be false, it was refusing to offer extensions beyond the initial 5-year term for the Protracer-SureShot agreement. When asked about its press release announcing  the Protracer acquisition, Topgolf stated that it did not want to promote alternatives or competitors to the Topgolf locations, hence its press release stating that only golf ranges (not entertainment facilities) would be using Protracer in the future.

36.     It was now obvious that Topgolf had no intention of allowing competition because the very purpose of its Protracer acquisition was to squelch competition, namely SureShot.  In short, Topgolf was unwilling to license the technology to

SureShot under terms that would allow SureShot to build its business around the technology platform.  SureShot told Topgolf that a 5-year term was insufficient to invest millions of dollars into a business when a competitor with Topgolf's market power had sole and exclusive control of the technology.  In doing so, Topgolf made it clear that it would not act as a neutral supplier of the essential and unique ball-tracking technology to golf entertainment facility competitors. Since that meeting, the market realities have proven SureShot correct: Protracer is owned by Topgolf and other than licenses to use  Toptracer Range by ranges, largely in golf and country clubs, the technology is not available for use by competitors in the golf entertainment market.

37.    Under those circumstances, SureShot's business was economically unfeasible. Effectively, and this has been borne out by the market realities, SureShot would have had to invest millions and millions of dollars only to lose its ability to continue to license the technology at the heart of its operations.  SureShot folded because of Topgolf's anticompetitive acquisition of Protracer.  Given Topgolf's refusal to assure SureShot access to the technology beyond the initial 5-year term (really shorter than that because the actual opening and operating of a facility would have more likely left 4 or fewer years on the initial term), SureShot's financial backing began to unravel.

38.    Since *SureShot I* and the facts alleged then, Topgolf's market dominance has grown. Toptracer, the new name for Protracer, is solely Topgolf's to use in its multiple brands and golf-related activities. In other words, the statements by the

Topgolf executive that SureShot should move on and find new technology are no longer, if they ever were, speculation. Topgolf has not shared and has no intention to share its acquired Protracer technology with competitors who want to compete with it at multiple locations throughout a region or the country. Thus,  SureShot's millions of dollar invested to compete have been unfairly lost. Under the circumstances, no purchases were made under the SureShot–Protracer agreement.

39.    With SureShot out of the way, Topgolf will continue to dominate and monopolize the golf entertainment centers market in the United States.  Such conduct harmed not only SureShot, but consumer choice and the overall market for golf entertainment centers.

## VI.    RELEVANT MARKET

40.    The relevant product/service market in which the restraint and other anticompetitive conduct of Defendant has had and will continue to have significant effects and cause antitrust injury is the market for golf entertainment centers involving technology that tracks balls and provide other information to customers in an entertainment venue. The relevant geographic market is the United States.

## VII.    ANTITRUST INJURY

41.    Topgolf's predatory behavior has been effective. SureShot closed its operations not long after Topgolf's anticompetitive acquisition of Protracer. Protracer is a platform technology provider, and SureShot built its business model on that basis. By acquiring Protracer, Topgolf purposefully froze out competition and furthered its monopolization of the market area.  After investing so much in the

Protracer technology format for its locations, SureShot did not have the financial resources as a start-up to then develop its own technology or to work with another supplier over time to develop a new technology platform. SureShot's closing results in harm to consumers, markets, and SureShot itself.

42.     The antitrust laws do not require a harmed competitor to continue to suffer great financial harm after the anticompetitive acts have been completed.

43.     Topgolf's conduct deprives SureShot of a competitive opportunity to enter the interactive virtual golf market, violating the antitrust laws. This conduct also constitutes actual and/or attempted monopolization, in that it has used its dominant market power to unfairly keep and expand its monopoly in the market. By eliminating SureShot, as well as other competitors who may have relied on Protracer, as a competitor, Topgolf will continue to strengthen its monopoly in the United States and internationally.  It will also deprive consumers of choice; a choice that would have offered a different experience at lower costs.

44.     SureShot has suffered injury, including the loss of its business and property.

### VIII.     VIOLATIONS ALLEGED

### A.     Foreclosure and unfair competition by a monopolist.

45.     SureShot realleges the material fact allegations in the preceding paragraphs.

46.     Defendant possesses dominant market power and monopolies in the market for golf entertainment facilities in the United States. It has used its power to

purchase and control Protracer, thereby unfairly denying SureShot access to long-term, continued licensing of Protracer technology and purchasing of Protracer equipment. By its acts, practices, and conduct, Defendant has insulated itself from and improperly foreclosed competition with SureShot and others for customers in the United States.

47.     By its acts, practices, and conduct, Defendant has pursued a course of conduct that amounts to monopolization or unlawful exercise of dominant market and monopoly power in violation of the antitrust laws.

48.     Defendant's conduct has significant anticompetitive effects and no pro-competitive benefits. The public has been deprived of the freedom to choose where and how to enjoy a golf entertainment experience and of the likely pricing choices that would naturally result from competition.

49.     As a direct and proximate result of Defendant's unlawful conduct, SureShot suffered injury in its business and property, including by being foreclosed from competitive long-term access to technology necessary to compete in the industry, which caused SureShot to close its business. These are injuries to the competitive process and are the type that the antitrust laws are intended to prohibit under the following statutes:

      a.  **Count 1**—Section 1 of the Sherman Act, 15 U.S.C. § 1;

      b.  **Count 2**—Section 2 of the Sherman Act, 15 U.S.C. § 2; and

      c.  **Count 3**—Section 7 of the Clayton Act, 15 U.S.C. § 18.

**B.      Attempt to monopolize—Count 4.**

50.     SureShot realleges the material fact allegations in the preceding paragraphs.

51.     Through its anticompetitive conduct, Defendant did and does intend to secure dominant market power and monopolies in the markets for golf entertainment centers in the United States. As evidenced by its market shares, abuse of market power, ability to exclude or foreclose competition, control access to essential technology, and the high barriers of entry into the relevant markets, Defendant's anticompetitive practices have had a direct adverse effect on competition. SureShot's closing is one such example.

52.     Defendant's conduct constitutes attempted monopolization in violation of the antitrust laws. This unlawful conduct has been willful and flagrant.

53.     As a direct and proximate result of Defendant's unlawful conduct, SureShot was forced to close its business, thereby suffering injury in its business and property. These are injuries to the competitive process and are the type that the antitrust laws are intended to prohibit.

## IX.     ATTORNEYS' FEES & COSTS

54.     Plaintiff SureShot is entitled to an award of attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15 and other statutory provisions.

## X. Jury Request

55.     Pursuant to the U.S. Const. amend. 7, Federal Rule of Civil Procedure 38, and Local Rule 38.1, Plaintiff SureShot hereby demands a trial by jury on all issues of fact.

## XI. Prayer

Plaintiff SureShot respectfully prays for the following relief:

a.      That the acts alleged above by Defendant Topgolf be adjudged violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 18.

b.      That judgment be entered for Plaintiff SureShot against Defendant for three times the amount of actual damages sustained;

c.      That Plaintiff SureShot recover from Defendant Topgolf all costs of Court and attorneys' fees;

d.      That Plaintiff SureShot be awarded pre- and post-judgment interest at the highest legal rate; and

e.      That Plaintiff SureShot receives such other relief as the Court may deem just and proper under law or equity.

Dated: May 18, 2020

Respectfully Submitted,

**TAHERZADEH, PC**

/s/ Mo Taherzadeh

MO TAHERZADEH
mo@taherzadehlaw.com
Texas Bar No. 24028022
Federal Bar No. 29596
550 Post Oak Blvd, Suite 580
Houston, Texas 77027
Telephone: (713) 360-6055
Facsimile: (713) 626-7113

ATTORNEYS FOR PLAINTIFF
SURESHOT GOLF VENTURES, INC.