Case 4:20-cv-01738 Document 24 Filed on 02/08/21 in TXSD Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
February 08, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SURESHOT GOLF VENTURES, INC., | § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:20-CV-01738 |
| TOPGOLF INTERNATIONAL, INC., | § § § | |
| Defendant. | § § | |

**ORDER**

Pending before the Court is Defendant Topgolf International, Inc.'s ("Topgolf") Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim. (Doc. No. 11). Plaintiff SureShot Golf Ventures, Inc. ("SureShot") responded (Doc. No. 17), and Topgolf replied (Doc. No. 18). Having considered the briefings, applicable law, and oral arguments made by counsel, this Court hereby **GRANTS** Topgolf's Motion to Dismiss.

### I. Background

A. Factual Background

As pleaded in SureShot's complaint, Topgolf was established in 2000 as a golf entertainment center. (Doc. No. 1 at 6). Topgolf venues combine a luxury golf simulation experience with other forms of entertainment, including video games and hospitality services. (*Id.* at 3). According to the pleadings, between 2000 and 2016, Topgolf was the only entertainment golf facility of its kind in the United States. (*Id.* at 4).

SureShot was established in 2014 to compete with Topgolf's entertainment centers. (*Id.* at 6). Like Topgolf, it planned to equip each venue with "a golf-driving-like range," a sports bar, and meeting rooms for corporate events. (*Id.* at 7). SureShot premised its game design on a ball-

1

tracking technology developed by the Swedish company, Protracer. (*Id.*). SureShot alleges that its game design was superior to Topgolf's because of its unique use of "high-speed cameras and sensors that track the golf ball in flight, which were developed by Protracer." (*Id.*). Moreover, SureShot contends that Protracer's proprietary technology was integral to its business model as "the only commercially available technology to a startup like SureShot to compete against Topgolf." (*Id.* at 8).

On April 17, 2015, SureShot entered into a five-year licensing agreement with Protracer ("the Frame Agreement"), which required Protracer to install the Protracer Range System in up to 500 SureShot bays and five SureShot facilities each year. (*Id.* at 10). The Frame Agreement additionally required Protracer to provide support and maintenance, and included automatic one-year renewals following the initial term, whereby either party could terminate by giving advance notice. (*Id.*). SureShot also alleges that Protracer stated that it would not enter any exclusive contracts. (*Id.*).

On May 24, 2016, Topgolf acquired Protracer. (*Id.* at 11).[1] SureShot alleges that this acquisition reflects Topgolf's intent to foreclose the market to SureShot and other competitors. (*Id.*). According to the pleadings, Topgolf rebranded Protracer as Toptracer,[2] and effectively ended any use of Protracer by outside competitors. (*Id.* at 12).[3] Instead, Topgolf has licensed Protracer to country clubs and golf clubs, which SureShot alleges are business ventures that enable "Topgolf's control of the essential components and licensing of the Protracer . . . technology." (*Id.*).

---

[1] Topgolf has since been acquired by Callaway Golf Company, a manufacturer and distributor of golf clubs, balls, and related items.
[2] While recognizing that Topgolf changed the name of the range system from Protracer to Toptracer after acquiring Protracer, the Court shall refer to it exclusively as Protracer for consistency in this order.
[3] This claim is somewhat incongruous to some of the other claims made by SureShot to the effect that Topgolf had no competitors and that SureShot would be the first one. All parties admit that Topgolf continued to honor the Protracer-SureShot agreement after it acquired Protracer.

2

Critically, SureShot alleges that Topgolf "was unwilling to license the technology to SureShot under terms that would allow SureShot to build its business around the technology platform." (*Id.* at 13–14). SureShot cites Topgolf's refusal to give assurances that Protracer would remain available after the expiration of the five-year Frame Agreement as evidence, alleging that a Topgolf executive stated: "If I was in your position, I would look for alternatives." (*Id.* at 13). According to the pleadings, when SureShot followed up on a contract extension, Topgolf stated that no decision had been made. (*Id.*). SureShot contends that under these circumstances, its financial backing began to unravel, and its business became economically unfeasible. (*Id.* at 14). At some point, SureShot ceased operations before ever opening a facility.[4]

B. *SureShot I*

SureShot filed a previous antitrust action against Topgolf in 2017. *See SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, CV H-17-127, 2017 WL 3658948, at *1 (S.D. Tex. Aug. 24, 2017), *aff'd as modified*, 754 Fed. Appx. 235 (5th Cir. 2018) ("*SureShot I*"). In that case, SureShot alleged four federal antitrust claims: "(1) conspiracy under Section 1 of the Sherman Act, (2) monopolization and (3) attempt to monopolize under Section 2 of the Sherman Act (15 U.S.C. § 1, 2), and (4) unlawful acquisition under section 7 of the Clayton Act (15 U.S.C. § 18)." *Id.* at *1. The District Court dismissed the case, holding that SureShot's claims were not ripe for consideration under Article III and that SureShot failed to plead an antitrust injury sufficient to confer antitrust standing. Specifically, the court held that a mere lack of assurances from Topgolf that Protracer would remain available to SureShot was not "equivalent to a denial of access."

---

[4] The complaint does not date these conversations or follow-up efforts. While SureShot did not explicitly plead this in its complaint, counsel for SureShot stated at the hearing on the Motion to Dismiss that it went out of business in 2016 before it could open its first location. If true, SureShot's effort to seek a renewal of a contract with either three to four years remaining in the primary term, or after it went out of business, may seem to some as being somewhat unusual.

3

Accordingly, the court found SureShot's claims to be too speculative to confer Article III standing. *Id.* at *4. The court also found that SureShot lacked antitrust standing because it failed to plead that Topgolf's acquisition of Protracer would "substantially lessen competition or tend to create a monopoly in the market overall." *Id.* at * 5.

The Fifth Circuit affirmed the dismissal along Article III standing grounds. *SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 Fed. Appx. 235 (5th Cir. 2018). The Circuit applied a two-part analysis, focusing on the complaint's deficiencies regarding the nature and immediacy of the alleged injury. *Id.* at 240. Relying on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), the Circuit first held that SureShot lacked standing because the injury alleged was "not certainly impending." The opinion highlighted that SureShot did *not* allege "that TopGolf unequivocally stated it would not extend the Frame Agreement beyond 2020." *SureShot*, 754 Fed. Appx. at 241. Next, it found that SureShot's claims of market foreclosure based on Topgolf's acquisition of Protracer were similarly speculative. The Fifth Circuit emphasized that all of the allegations, including that the acquisition would "cut off the supply to SureShot of the unique, leading-edge Protracer technology," and enable Topgolf to send "less qualified personnel for installation and services requests," were phrased in future terms. *Id.*

C. The Present Action ("*SureShot II*")

On May 17, 2020, SureShot filed this suit against Topgolf again for antitrust violations. (Doc. No. 1). The lawsuit arises out of the same set of facts as *SureShot I*, but here SureShot contends that additional facts establish that its claims are now ripe. (*Id.* at 2). As in the previous action, SureShot seeks relief for Defendant's alleged violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18, based upon the theory of foreclosure and unfair competition by a monopolist, as well as an alleged attempt to monopolize. (Doc. No. 1

4

at 16–18). In response to the complaint, Topgolf filed a Motion to Dismiss (Doc. No. 11), SureShot responded (Doc. No. 17), and Topgolf replied thereto (Doc. No. 18).

## II. Legal Standards

A. <u>Motion to Dismiss for Lack of Jurisdiction</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's subject matter jurisdiction. Federal courts have limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims. *See Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim. *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

B. <u>Motion to Dismiss for Failure to State a Claim</u>

A party may file a motion to dismiss claims against it for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To defeat a motion under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm*

*Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

C. Sherman Act, § 1

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. While section 1 could be interpreted to proscribe all contracts, *see, e.g., Board of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918), it is never "taken [as] a literal approach to [its] language." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Rather, section 1 "outlaw[s] only unreasonable restraints [on trade]." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

D. Sherman Act, § 2

Section 2 of the Sherman Act makes it unlawful for an entity to "monopolize." 15 U.S.C. § 2. Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). To prove monopolization, a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). A prerequisite of an attempted monopolization or monopolization claim is proof of the relevant market. *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir. 1985).

E. Clayton Act, § 7

Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be "substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18; *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531 (1973). But the allegation of a "mere possibility of a prohibited restraint or tendency to monopol[ize] will not establish the statutory requirement...." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 598 (1957).[5]

### III.  Legal Analysis

Topgolf argues that no material facts or legal allegations have changed since the Fifth Circuit affirmed the District Court's holding that SureShot lacked Article III standing because it had not alleged that Topgolf terminated or refused to extend SureShot's license agreement. (Doc. No. 11 at 6). In fact, Topgolf contends that one of the very few new allegations—that the Frame Agreement included an automatic option to renew unless either party provides notice of termination—provides even less support for Article III standing. (*Id.* at 12). Now, according to Topgolf, SureShot fails to allege not only that its license was ever terminated, which was fatal to its claims in *SureShot I*, but also fails to allege that Topgolf ever gave notice of its intention to exercise its option to terminate the license. (*Id.*).

Additionally, Topgolf contends that SureShot has failed to allege an antitrust injury. (*Id.* at 13). Topgolf once again states that an antitrust injury requires a plaintiff to show the injury "flow[s] from that which makes the defendants' acts unlawful." (*Id.*). Relying on the trial court's reasoning in *SureShot I*, Topgolf asserts that even if it *had* refused to license Protracer to SureShot, SureShot "would have suffered the same loss if the refusal had resulted from any of many other

---

[5] Count 4 of the complaint alleges a claim for "attempt to monopolize," but this cause of action is not tethered to any particular statute or set of elements. (Doc. No. 1 at 18).

7

plausible bases." (*Id.* at 15); *see SureShot I* at *5. Topgolf also argues that SureShot's pleadings did not adequately plead the required elements of its antitrust claims. (*Id.* at 15).

In response, SureShot argues that its claims satisfy the requirements of Article III and antitrust standing, and that it has alleged a "classic" antitrust case. (Doc. No. 17 at 8 & 15). SureShot contends that at this stage of the case, it has adequately alleged that it was harmed by Topgolf's acquisition of Protracer. SureShot argues that the Court should not rely on *Clapper's* demanding standing requirements, because *Clapper* is inapplicable to antitrust cases. (*Id.* at 10–11).[6] Furthermore, SureShot disputes Topgolf's antitrust injury contention—and the trial court's opinion in *SureShot I*—that the same injury would have occurred had a smaller company bought Protracer. SureShot rejects that reasoning because, according to it, that analysis fails to account for Topgolf's role as a "monopolist" and for what it claims is the reality that Topgolf's acquisition of Protracer decreased competition. (*Id.* at 12–14).

A. Article III Standing

Article III standing requires that a plaintiff have: "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). The Supreme Court held in *Spokeo* that a concrete injury requires that an injury must "actually exist." *Id.* at 1548–49; *accord Clapper*, 568 U.S. at 409.

The Court substantially agrees with Topgolf's contention that no material facts have changed from *SureShot I* and neither has the substance of the complaint. Without factual allegations to support that SureShot was denied access to Protracer or otherwise informed that its

---

[6] This, of course, ignores the fact that the Fifth Circuit in this very antitrust case cited *Clapper* as authority.

8

access would terminate, this Court remains bound by the Fifth Circuit's holding that SureShot has failed to show an injury capable of redressability—as required for Article III standing.

In *SureShot*, 754 Fed. Appx. 235, the Fifth Circuit analyzed SureShot's Article III injury through the lens of the Supreme Court decision in *Clapper*, wherein the Supreme Court held that the threatened injury must be certainly impending to constitute injury in fact. *Clapper*, 568 U.S. at 409. The Fifth Circuit found:

> SureShot's alleged injury is not "certainly impending." The complaint does not allege that the SureShot-Protracer Frame Agreement included an option to renew, nor does it allege that Topgolf unequivocally stated it would not extend the Frame Agreement beyond 2020. The closest Topgolf came to denying future use of the Protracer technology was the statement of its unnamed top executive who advised SureShot to seek alternative ball-tracking technology in developing its business, which did not immediately terminate the SureShot-Protracer agreement.

*SureShot*, 754 Fed. Appx. at 241. It must be noted that no facts that have been alleged convey that SureShot's relationship with Topgolf has changed since the filing of the complaint in *SureShot I*, as SureShot was *already* out of business by the time it was filed in 2017. Not surprisingly, SureShot's new complaint has not cured the pleadings that the Fifth Circuit found defective in *SureShot I*. There are only two new relevant allegations: 1) the Frame Agreement included an automatic option to renew unless either party gave notice of termination (Doc. No. 1 at 10); and 2) when SureShot sought clarification about an extension of the license, a Topgolf executive said that no decision had been made. (*Id.* at 13). Neither of these new allegations changes the analysis. First, while the Fifth Circuit did point out that SureShot failed to allege an option to renew, the new pleadings indicate that there was an option to renew *"although either party could terminate the agreement by giving advance notice."* (*Id.* at 10) (emphasis added). The inclusion of this allegation, therefore, does not correct any of the *SureShot I* defects, but rather compounds the already existing problem: Apparently SureShot cannot allege (and certainly has not alleged) that

9

Topgolf gave advance notice of an intent to terminate the agreement. Similarly, the addition of the equivocal statement that "no decision had been made" is no different than the allegations the Fifth Circuit and the District Court already found insufficient. *SureShot,* 754 Fed. Appx at 241; *SureShot I,* at * 4. It remains inescapable that the perceived but unspoken (or unconveyed in any fashion) threat of the possibility that Topgolf might withhold Protracer in the future was the motivation for SureShot's decision to cease operations.[7]

The Fifth Circuit also analyzed the Article III injury requirements as they relate to market foreclosure:

> SureShot's claims of market foreclosure stemming from the Topgolf-Protracer acquisition are similarly speculative. SureShot alleges that Topgolf's acquisition of the Protracer Range System would "cut off the supply to SureShot of the unique, leading-edge Protracer technology," give Topgolf control over licensing agreements, and authorize it to extend agreements to businesses interested in using the Protracer technology to open businesses other than golf entertainment facilities thereby controlling prices and sending less qualified personnel for installation and service requests. However, all of the allegations SureShot identifies for us are phrased in future terms, and Sureshot has not alleged that any of the federal antitrust violations have resulted in the above-referenced feared actions.

*SureShot,* 754 Fed. Appx at 241. The tense used in SureShot's pleadings may have shifted from future tense in *SureShot I* to present tense here, but the speculative nature has not changed. The complaint assumes anticompetitive behavior that it admits has never happened. The Court acknowledges that the new complaint may present more details about SureShot's perceived harm stemming from possible market foreclosure, particularly with respect to Topgolf's use of Protracer. Perception in this case does not automatically equate to reality. SureShot alleges that after the

---

[7] At oral argument, SureShot disputed the Court's characterization of its decision to cease operations as borne out of "fear," namely the threat of being cut off from the needed technology after having invested so much money. SureShot rephrased the characterization to state that its decision to quit was motivated by a rational thought or belief. The Court understands that this description may very well be more accurate; nevertheless, assuming it was a rational decision, it was one made not because of some action taken by Topgolf, but because of SureShot's anxiety that it could be denied access to Protracer in the future. For antitrust pleading purposes, this is a distinction without a difference.

10

acquisition, Topgolf announced it would license Protracer only to driving ranges, and thereafter licensed its range business, Toptracer Range, to country and golf clubs. (Doc. No. 1 at 12). SureShot argues that these "market realities . . . further establish that Topgolf has invested more money and branding to make Protracer a core asset of Topgolf's business, rebranding it as 'Toptracer,' and there is no indication in the marketplace that Topgolf is licensing Protracer to competitors in any significant way." (Doc. No. 17 at 11).

The Court concedes that based on the complaint, Topgolf's unwillingness to license Protracer to other fledgling businesses like SureShot, if they indeed exist, is arguably not as speculative as it may have been at the time of *SureShot I*. Conversely, SureShot has also alleged that Topgolf does license the technology to golf and country clubs and other driving ranges. Clearly, it is not hoarding the technology for itself. Topgolf is under no obligation to license Protracer just to SureShot. While the Court considers these allegations to be suggestive of possible harm to unknown others caused by market foreclosure, they are not strong enough to outweigh the major gap in the pleadings that initially concerned the Fifth Circuit: SureShot has not alleged any kind of denial of access to establish that it suffered an injury-in-fact.[8] Moreover, the fact that it has alleged that Protracer has been licensed to a variety of golf entities would seemingly create more, not less, competition—at least as far as the driving range portion of the business.

B. <u>Antitrust Standing</u>

Plaintiffs must allege antitrust injury to establish standing to sue for antitrust violations. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

---

[8] The thrust of SureShot's response to Topgolf's argument that it lacks standing is that the pleading stage is the improper time to address antitrust injury and that Topgolf erroneously relies on *Clapper* instead of antitrust cases. The Court, however, follows the precedent of the Fifth Circuit, which not only affirmed *SureShot I*'s ruling on a motion to dismiss, but also specifically applied *Clapper* to assess these very Article III standing issues. Moreover, it is important to remember that) *Twombly* was an antitrust case in which the Supreme Court specifically held that the pleadings were insufficient at this very stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109 (1986). The Supreme Court has held that a plaintiff lacks antitrust standing if the same injury-in-fact would have occurred had a company of another size purchased the competing business. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977). The Fifth Circuit has "narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition." *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 2248, 249 (5th Cir. 1992).

The Court agrees with Topgolf that pursuant to the Fifth Circuit requirements, SureShot has failed to plead an antitrust injury. SureShot's alleged injury stems from the belief that it felt forced to close its business, before it ever got off the ground, because it could not rely on the availability of Protracer after the expiration of the Frame Agreement. SureShot has not alleged that this particular harm would be any different if Protracer, itself, decided not to extend the licensure contract, or if a company other than Topgolf had acquired Protracer. *See Brunswick*, 429 U.S. at 786 (finding plaintiff's loss bore no relationship to the size or status of the defendant's company, because the loss would have been the same if a smaller company had acquired the business); *see also Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 312, 321 (5th Cir. 2009) (finding no horizontal restraint of trade when plaintiff would have suffered the same loss had a non-defendant purchased the assets). The risk that SureShot pleads existed from the very start of SureShot's decision to enter this market without owning the critical piece of technology, regardless of Topgolf's subsequent acquisition. Thus, the pleadings fail to establish an antitrust injury of the type "the antitrust laws were intended to prevent." *Cargill*, 479 U.S. at 104.

It is true that the allegations in this complaint may, for purposes of the Sherman Act, allege a monopolistic intent by Topgolf in its acquisition. Merely alleging monopolistic intent or motive is not enough, nor does it satisfy the requirement to plead an antitrust injury. *See Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (including "improper motive" as only one of six relevant factors to determine antitrust standing). Fatal to SureShot's claim, this alleged monopolistic intent is not adequately tethered to any antitrust activities or to an antitrust-related injury allegedly suffered by SureShot. *See id.* (listing three of the other relevant factors as: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress; and (3) the directness with which the alleged market restraint caused the asserted injury). The only "injury" to SureShot is that it was allegedly unable to enter the market because it perceived, whether accurately or not, that it could not rely on the availability of Protracer beyond its current contract. This is the same situation that SureShot has been in since it entered into the Frame Agreement, and it remained true whether Protracer was bought by Topgolf or not. Clearly, this "injury" did not arise because SureShot did not have access to Protracer or because Topgolf committed some untoward or anticompetitive act. The "injury" is neither tied to Topgolf's alleged position as a monopolist, nor to *any* concrete denial or even a purported denial of access.

### IV. Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Topgolf's Motion to Dismiss (Doc. No. 11). SureShot's claims are hereby **DISMISSED**.

Signed at Houston, Texas, this __8th__ day of February, 2021.

Andrew S. Hanen
United States District Judge

13